**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| CHARLES E. ROBERTS, ) | |
| ) | CASE NO.    1:09-cv-01518 |
| Plaintiff, ) | |
| ) | |
| v. ) | MAGISTRATE JUDGE GREG WHITE |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security ) | **MEMORANDUM OPINION & ORDER** |
| ) | |
| Defendant. ) | |

Plaintiff Charles E. Roberts ("Roberts") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Roberts's claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. The Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, this Court AFFIRMS the final decision of the Commissioner.

## I.  Procedural History

On March 23, 2007, Roberts filed an application for POD, DIB, and SSI alleging a disability onset date of November 3, 2006, and claiming that he was disabled due to chronic pain.  His application was denied both initially and upon reconsideration.  Roberts timely requested an administrative hearing.

On December 11, 2008, an Administrative Law Judge ("ALJ") held a hearing during which Roberts, represented by counsel, testified.  Elaine G. Cogliano testified as a vocational expert ("VE").  On January 29, 2009, the ALJ found Roberts was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

## II.  Evidence

### *Personal and Vocational Evidence*

Born on March 9, 1958, and age fifty (50) at the time of his administrative hearing, Roberts is a "person closely approaching advanced age" under social security regulations.  *See* 20 C.F.R. § 404.1563(d) & 416.963 (d).  Roberts has a high school education and attended some college classes.  He has past relevant work as a waiter and aquatic director.  (Tr. 18.)

### *Medical Evidence*

In 1995, Roberts suffered a gunshot to his back; the bullet was surgically removed.  (Tr. 206.)

In 1996, Roberts was seen by John K. Johnson, M.D.  (Tr. 203.)  Roberts continued to complain of weakness and numbness in his left lower extremity and trouble tolerating sitting and standing.  *Id*.

On December 15, 2006, Roberts was seen at Third Street Family Health Services due to complaints of low back pain and sciatica. (Tr. 254.) Examination revealed a lumbar scar, lumbosacral tenderness, positive straight leg raising, and decreased flexion. (Tr. 255.) He was diagnosed with low back pain and dyslipidemia, and prescribed Percocet. *Id*.

On March 20, 2007, Roberts underwent an MRI of his lumbar spine, which revealed degenerative disc changes at L1-2, L4-5, and L5-S1, including some focal mild left paracentral/left lateral disc protrusion at L5-S1, as well as mild apophyseal joint arthropathy. (Tr. 262.) The same day, Roberts also underwent an MRI of his left hip, which was "unremarkable." (Tr. 263.)

On April 10, 2007, Roberts was seen by Aaron R. Becker, Psy.D., at the request of the Richland County Department of Job and Family Services for a Mental Functional Capacity assessment. (Tr. 277-80.) Roberts reported chronic pain, problems with "feeling very low," and trouble getting out of bed. (Tr. 277.) Roberts noted some recent improvement stating that he no longer felt "depressed all day every day." (Tr. 278.) Dr. Becker diagnosed Roberts with adjustment disorder, with depressed mood, chronic. (Tr. 279.) Dr. Becker found that there was no evidence that Roberts was disabled from a psychological perspective. (Tr. 280.)

On April 26, 2007, state agency physician Jon Starr, M.D., completed a Residual Functional Capacity ("RFC") assessment (Tr. 268.) Dr. Starr concluded that Roberts could lift and/or carry up to 50 pounds occasionally and up to 25 pounds frequently, could stand/walk and sit for about 6 hours in an 8-hour workday, and push or pull to an unlimited degree. (Tr. 269.) Dr. Starr further concluded that Roberts could frequently climb ramps and stairs, stoop and crouch, but could only occasionally climb ladders, ropes or scaffolds. (Tr. 270.) In reaching

3

these conclusions, Dr. Starr noted that Roberts had not voiced complaints of pain until recently, and his medical findings revealed only minor abnormalities. (Tr. 275.) In addition, because Roberts used a cane and wore a back brace at his March 23, 2007 follow-up visit when neither one was recommended or prescribed, Dr. Starr concluded that there was "at least some level of exaggeration." *Id.*

On June 19, 2007, neurologist Raymond Baddour, M.D., evaluated Roberts, who reported last working in December 2006. (Tr. 301.) Dr. Baddour noted that Roberts could ambulate independently, although he used a cane. *Id.* Dr. Baddour noted that Roberts reported leg pain and weakness, and had some atrophy in his left calf muscles. *Id.* Upon examination, Dr. Baddour noted Roberts was well developed and in no acute distress, had normal deep tendon reflexes and motor strength, albeit slightly reduced in his left calf muscles. (Tr. 302.) Roberts had no sensory deficits to vibration, but there was decreased soft touch and pinprick sensation in his left foot. *Id.* Roberts had a slow gait, as he ambulated with a left limp, but he had a negative straight leg raising test. *Id.* Dr. Baddour indicated that Roberts's chronic pain, leg weakness, and gait imbalance would render him unable to sit, stand or walk for more than thirty minutes at a time. (Tr. 297.) He further opined that Roberts should not bend, stoop, or lift, and referred Roberts for more testing. (Tr. 297; 303.)

On June 25, 2007, Sarah Blake, M.D., saw Roberts for his reported back and leg pain. (Tr. 304.) Dr. Blake noted that Roberts's extremities were normal, but he had a positive straight leg raising test on the left and an antalgic gait and station. (Tr. 305.) Dr. Blake diagnosed lumbar degenerative disk disease and radiculitis. *Id.* She prescribed physical therapy and steroid injections. *Id.*

On June 28, 2007, Roberts received the first of several steroid injections. (Tr. 306-07, 361, 369.)

On July 5, 2007, Roberts underwent EMG testing, which showed mild to moderate left S1 radiculopathy. (Tr. 298.)

On August 27, 2007, Roberts again saw Dr. Baddour for a follow-up visit. (Tr. 314.) Roberts stated that his medication was of "modest benefit," and that his steroid injections had not been of benefit to date. *Id*. Dr. Baddour observed that Roberts's strength was normal, except slightly reduced in his left calf muscles, and he had a slow gait, walking with a left limp. *Id*. Dr. Baddour concluded that Roberts was "permanently and 100% disabled." (Tr. 315.)

On September 19, 2007, John Waddell, Ph.D., completed a Psychiatric Review Technique form and concluded that Roberts did not suffer from a severe mental impairment. (Tr. 316-28.)

On October 2, 2007, state agency physician Esberdado Villanueva, M.D., reviewed the medical evidence. (Tr. 330.) Dr. Villanueva affirmed Dr. Starr's previous RFC findings. *Id*.

On October 3, 2007, Dr. Blake administered another steroid injection. (Tr. 344). Roberts reported that the injections were "very helpful," and he had been able to mow the grass for the first time without difficulty. *Id*.

On November 20, 2007, Dr. Blake completed an RFC form, and indicated that Roberts could sit continuously for eight hours, stand continuously for three hours, and walk continuously for two hours in an eight-hour work day. (Tr. 334.) She further opined that Roberts could lift up to twenty pounds occasionally and up to ten pounds frequently, he could frequently reach above shoulder level, occasionally bend, squat and climb, but never crawl, and that he had mild

restrictions around unprotected heights and moving machinery.  *Id*.  Dr. Blake concluded that Roberts could not participate in substantial gainful activity due to poorly controlled pain.  *Id*.

On November 27, 2007, Dr. Blake saw Roberts on a follow-up visit, and noted he had normal gait and station.  (Tr. 332.)  Roberts reported his injections "helped his back considerably."  *Id*.  Dr. Blake diagnosed hip tendinitis, lumbar degenerative disk disease, and lumbar spondylosis.  *Id*.  She continued Roberts's medications, and recommended aquatic therapy.  *Id*.

On January 7, 2008, Dr. Blake again saw Roberts, who reported that the benefits of steroid injections had worn off.  (Tr. 421.)  Dr. Blake continued Roberts's pain medication, referred him for aquatic therapy, and advised him to call her if his pain worsened in the next four weeks.  *Id*.  Two weeks later, on January 21, 2008, Roberts returned for an injection saying the injections were "very helpful," and that he had "been doing well for the last three months."  (Tr. 401.)  He received another injection on January 30, 2008.  (Tr. 402.)  He continued to receive injections over the next several months.  (Tr. 403-06, 422-24.)

On April 23, 2008, Roberts was evaluated by psychiatrist Rashid Pervez, M.D.  (Tr. 533-534.)  Roberts reported feeling more depressed over the last several months, anxious, and guilty about being unable to work.  *Id*.  Dr. Pervez diagnosed Roberts with major depressive disorder, moderate, recurrent and rated his Global Assessment of Functioning (GAF) at 45.[1]  *Id*.

---

[1]  A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.  A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised, 2000).

On July 30, 2008, Roberts told Dr. Pervez that he was feeling very tense and anxious after hearing gunshots in his neighborhood, which reminded him of his assault. (Tr. 531.) He stayed in his house for four or five days feeling depressed, anxious, fearful, and paranoid. *Id*.

On August 13, 2008, Roberts reported to Dr. Blake that the injections "were very helpful," but he suffered from "sharp and stabbing" pain. (Tr. 424.) Dr. Blake continued his medications, and recommended that he return for a radiofrequency ablution of his lower back. *Id*.

On September 9, 2008, Roberts told Dr. Blake that the injections had been helpful, but he continued to have discomfort. (Tr. 425.) Dr. Blake noted that Roberts's radiofrequency ablution revealed no listhesis. *Id*.

On November 4, 2008, Dr. Pervez completed a medical source statement concluding as follows: Roberts was moderately limited in his abilities to understand, remember and carry out detailed instructions; slightly limited in his ability to understand, remember, and carry out simple instructions; and slightly limited in his ability to make judgments on simple work-related decisions. (Tr. 509.) Furthermore, Roberts was moderately limited in each of the following categories: his ability to interact appropriately with the public, supervisors, and co-workers; and his ability to respond appropriately to work pressures and/or changes in a routine work setting. (Tr. 510.)

Also in November 2008, an unsigned Mental Functional Capacity Assessment was completed by Dr. Pervez. (Tr. 528-530.) Dr. Pervez noted moderate limitations in the following areas: Roberts's ability to maintain attention and concentration for extended periods, his ability to work in coordination with or proximity to others without being distracted by them, his ability

7

to complete a normal workday and workweek without interruptions from psychologically based symptoms, his ability to perform at a consistent pace without an unreasonable number and length of rest periods, and his ability to travel in unfamiliar places or use public transportation. (Tr. 528.)

Throughout 2008, Roberts was seen numerous times by Dr. Baddour. (Tr. 514-24.) On November 21, 2008, Dr. Baddour wrote on a notepad that "Charles Roberts is permanently 100% disabled." (Tr. 513.) On December 5, 2008, Roberts reported to Dr. Baddour that his last injection and Valium were beneficial. (Tr. 514.) Dr. Baddour also completed an RFC form, indicating that Roberts could sit, stand and walk for less than one hour continuously, but could sit for up to two hours with rest. (Tr. 527.) He further opined that Roberts could occasionally lift and carry up to ten pounds, and occasionally reach above shoulder level, but never bend, squat, crawl, or climb. *Id.* Dr. Baddour indicated that Roberts had mild restrictions concerning exposure to dust, fumes and gases, but no other environmental restrictions. *Id.* He concluded that Roberts could not participate in substantial gainful activity, and he expected this restriction to last more than twelve months. *Id.*

On December 29, 2008, Dr. Baddour competed a basic medical form for the Ohio Department of Jobs and Family Services. (Tr. 662-64.) Dr. Baddour indicated that Roberts had lumbrosacral radiculopathy, depression and anxiety, and that his health was good/stable with treatment. (Tr. 662.) Dr. Baddour indicated that Roberts could stand for two hours and sit for four hours in an eight-hour workday in twenty minute intervals. (Tr. 663.) Dr. Baddour further indicated that Roberts could lift or carry up to five pounds frequently/occasionally. *Id.* He also indicated that Roberts was extremely limited in his ability to push/pull and bend, markedly

8

limited in his ability to reach, and moderately limited in his ability to handle. *Id.* Dr. Baddour indicated that Roberts's limitations would last for twelve months or more. *Id.*

### *Hearing Testimony*

At the hearing, Roberts testified to the following:

- He normally ambulates with a cane in public, but has a walker at home. (Tr. 28.)

- He has not worked in at least two years and lives off of welfare checks and food stamps. (Tr. 31.)

- He can no longer work due to pain stemming from a gunshot wound in 1995. Though he worked through the pain for twelve years, it had become worse as he got older. His pain is concentrated in his lower back, hips, and feet. He rated his pain as a ten out of ten without medication, and as varying between five and eight out of ten with medication. (Tr. 31-33.)

- He suffers from deep depression, receives treatment for it from Dr. Pervez, and has a prescription for Prozac. (Tr. 34-35.)

- He has a past history of substance abuse, but has been sober since 2000. (Tr. 35.)

- He can sit for twenty minutes before becoming uncomfortable, stand for about three to ten minutes before needing to sit down, and walk for ten to fifteen minutes with a cane. (Tr. 36-37; 40.)

- He can lift a gallon of milk "fine" if there is no bending involved. He does not have any problems picking up small objects with his fingers. (Tr. 37.)

- He can bathe and dress without assistance, though sometimes needs help with his shoes. (Tr. 38.)

The ALJ posed the following hypothetical to the VE:

I'd ask you to assume an individual the claimant's age, education, and work experience. The individual would be limited to what Social Security calls light work allowing for simple unskilled tasks. A sit/stand option at will. Work should be outside of environments having more than incidental exposure to extremes of cold, heat, humidity, fume, dust, gases, or vibration. Work should not entail any overhead lifting or reaching or the operation of foot or leg controls. Work should not be performed at heights or using ladders, ropes, or scaffolding. Work should not entail more than occasional, occasional being defined as up to one-third of the

9

>time, use of ramps, stairs, stooping, crouching, crawling, and kneeling. Would individuals [s]o limited be able to perform the claimant's past jobs or other jobs existing in the local or national economy.

(Tr. 44-45.)

The VE testified that such an individual could not perform Roberts's past relevant work. (Tr. 45.) However, such an individual could perform the following jobs: information clerk (2,000 in Ohio, 100,000 nationally); security guard (1,500 in Ohio, 75,000 nationally); inspector position (3,500 in Ohio, 250,000 nationally). *Id*. The ALJ proposed a few additional limitations to the earlier hypothetical: chronic pain with the potential side effects of a variety of medications leading an individual to be off task at least twenty-five (25) percent of the time. *Id*. According to the VE, a person with the added limitations would not be employable. *Id*.

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[2]

---

[2] The entire five-step process entails the following: First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Roberts was insured on his alleged disability onset date, November 3, 2006, and remained insured through December 31, 2011. (Tr.13.) Therefore, in order to be entitled to POD and DIB, Roberts must establish a continuous twelve month period of disability commencing between November 3, 2006, and the date of the ALJ's decision. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

A claimant may also be entitled to receive SSI benefits under the Act when he establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

### IV. Summary of Commissioner's Decision

The ALJ found Roberts established a medically determinable, severe impairment, due to degenerative disc disease status post gunshot wound.[3] (Tr. 13.) However, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Roberts is unable to perform his past work activities, but has a Residual Functional Capacity ("RFC") for a limited range of light work. The ALJ then used the Medical Vocational

---

in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

[3] The ALJ found that Roberts's mental impairment was non-severe. (Tr. 15.)

Guidelines ("the grid") as a framework and VE testimony to determine that Roberts is not disabled.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI.  Analysis

On appeal, Roberts claims the ALJ erred because: (1) she failed to ascribe proper weight to the opinions of his treating physicians; and (2) substantial evidence did not support her finding that Roberts was not disabled by his pain.

### *Treating Physicians*

Roberts argues that the ALJ should have ascribed controlling weight to the opinions of Dr. Blake and Dr. Baddour.  (Pl.'s Br. at 13.)  Alternatively, Roberts contends that the ALJ failed to provide good reasons for the weight accorded their opinions.  *Id*. at 14.

Under Social Security regulations, the opinion of a treating physician is entitled to

controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 F. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[4]

The opinion of a treating physician must also be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent the with other substantial evidence in the case record.") (*quoting* SSR 96-2p).

---

[4] Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

To the extent Dr. Blake and Dr. Baddour opined that Roberts is unemployable or permanently disabled, the ALJ's failure to give any weight to such a determination is not error, as a medical source's conclusion that a claimant is "unemployable" does not constitute a medical opinion, and, therefore, is not entitled to any special weight. An opinion that a claimant is disabled is an issue expressly reserved for the Commissioner and does not constitute a medical opinion. 20 C.F.R. § 404.1527(e). An ALJ need not give any weight to a conclusory statement of a treating physician that a claimant is disabled, and may reject determinations of such a physician when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Sec' of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir.1984). "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled," as it is the Commissioner who must make the final decision on the ultimate issue of whether an individual is able to work. *See* 20 C.F.R. § 404.1527(e)(1); *Duncan*, 801 F.2d at 855; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982). As such, the ALJ did not err by failing to assign any weight to the treating physicians' opinions that Roberts was disabled or unemployable.

However, Dr. Blake and Dr. Baddour both found that Roberts had functional limitations that were more restrictive than those ultimately found by the ALJ. The ALJ did not ascribe significant weight to these opinions and explained as follows:

> In a report dated November 20, 2007, Dr. Blake indicated the claimant could lift 20 pounds occasionally and 10 pounds frequently. In an 8-hour workday, the claimant was limited to standing for three hours, walking for two hours, and sitting for eight hours. Dr. Blake opined the claimant is incapable of participating in substantial gainful activity, indicating the claimant has "poorly controlled pain" (Exhibit 14F-3).

14

The undersigned does not give controlling weight to the opinion of Dr. Blake regarding the claimant's unemployability. The undersigned notes the specific limitations imposed by Dr. Blake are actually consistent with full-time work, specifically her contention the claimant can sit for eight hours, stand for three hours, and walk for two hours per 8-hour day. Furthermore, Dr. Blake's treatment notes are not consistent with her opinion regarding disability. On October 3, 2007, Dr. Blake noted the claimant's report that the injections he had been receiving were "very helpful" and he was even able to mow his lawn for the first time without difficulty (Exhibit 14F13). On November 27, 2007, Dr. Blake indicated the claimant had received facet injections "which have helped his back considerably;" although the claimant reported bilateral hip pain, he exhibited normal gait and station. Dr. Blake advised the claimant to consider aquatic therapy for hip tendonitis (Exhibit 14F-l). On January 21, 2008, the claimant reported the injections were "very helpful, and he has been doing well for the last three months" (Exhibit 15F-14). On September 9, 2008, the claimant continued to exhibit normal gait and station; recent flexion/extension views of the back showed no listhesis (Exhibit 15F-38).

\*\*\*

In a note dated November 21, 2008, Raymond Baddour, M.D., stated the claimant is "permanently 100% disabled" (Exhibit 18F). In a functional capacity statement dated December 5, 2008, Dr. Baddour specifically indicated the claimant can lift no more than 10 pounds occasionally and sit, stand, and/or walk for less than one (continuous) hour each per 8-hour day (Exhibit 20F). The undersigned finds the objective findings fail to fully support the limits imposed by Dr. Baddour. In a note dated September 28, 2007, Dr. Baddour noted a lumbar MRI performed on March 20, 2007, revealed a small left paracentral/left lateral L5-S 1 disc herniation mildly [the undersigned's emphasis added] impinging upon the left Sl nerve root. MRI of the left hip performed on March 20, 2007, was unremarkable. EMG/nerve conduction studies of the lower extremities performed on July 5, 2007, revealed mild to moderate left Sl radiculopathy. Dr. Baddour maintained the claimant on medications including Percocet and Valium, which the claimant reported helped his symptoms. On June 10, 2008, Dr. Baddour noted the claimant's last lumbar epidural steroid injection was of benefit, as was Valium (Exhibit 19F-6). Aside from 4/5 strength in the left calf muscles, the claimant exhibited 5/5 strength throughout on multiple dates (see Exhibit 19F-4, 3). On October 10, 2008, Dr. Baddour confirmed the claimant's prior left hip trigger point injection was of benefit (Exhibit 19F-2). The undersigned finds Dr. Baddour's observations as contained in the treatment notes, showing the claimant was receiving some improvement in signs and symptoms with medications and injections, fails to support the degree of limitations he identified in the functional capacity assessment.

(Tr. 17-18.)

Roberts essentially asks this Court to find the ALJ's determination – that objective medical evidence did not support the functional limitations found by the treating physicians – was incorrect in that the ALJ misinterpreted the evidence or placed too much emphasis on certain portions of the medical record while downplaying the significance of other portions.[5] However, such a request is tantamount to asking this Court to conduct a *de novo* review. The Court, however, is confined to determining whether the ALJ followed the proper procedures in not ascribing significant or controlling weight to the opinions of two treating physicians and whether the finding was supported by substantial evidence. The ALJ clearly addressed the opinions, and gave good reasons for rejecting the functional limitations contained therein – namely the lack of supporting objective medical evidence and internal inconsistencies in the treatment notes. As such, Robert's assignment of error is without merit.

### *Disabling Pain*

Roberts also argues that substantial evidence fails to support the ALJ's finding that he was not disabled due to pain. (Pl.'s Br. at 20-23.) It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability. *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step

---

[5] The ALJ's opinion is also consistent with that of state examining physician Dr. Starr, who indicated that objective tests only revealed minor abnormalities. (Tr. 275.) Although Roberts argues that the opinion of the state agency physician Dr. Starr predated the treatment rendered by Dr. Blake and Dr. Baddour in the second half of 2007 and in 2008, it bears noting that the results of objective medical tests, notably two MRIs performed in March of 2007, were available to Dr. Starr. Though an EMG performed in July of 2007 occurred after Dr. Starr's assessment, it revealed only mild to moderate left S1 radiculopathy. (Tr. 298.)

process for evaluating these symptoms. First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment. Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms." SSR 96-7p. Essentially, the same test applies where the alleged symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence supports a finding of an underlying medical condition, and (2) whether the objective medical evidence confirms the alleged severity of pain or whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *See Felisky v. Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. *Id*. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight." SSR 96-7p, Purpose section; *see also Felisky,* 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so"); *Cross*, 373 F. Supp. 2d at 733 (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the

regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* SSR 96-7p, Purpose. Beyond medical evidence, there are seven factors that the ALJ should consider.[6] The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ was clearly conscious of his responsibility to conduct a credibility analysis. He accurately set forth the factors to be considered. (Tr. 15.) The ALJ found that Roberts's impairments could reasonably be expected to produce the symptoms alleged, but that his statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent with the RFC found by the ALJ. (Tr. 16.) Roberts argues that the only credibility analysis contained in the ALJ's opinion is the following excerpt:

> The undersigned particularly finds the objective findings fail to fully support the claimant's allegations of pain and limitations. The claimant's gunshot wound is remote and he has produced little evidence of treatment prior to 2006. EMG has confirmed only mild to moderate radiculopathy, despite the claimant's allegations of debilitating pain and pins and needles sensation in the lower extremities. The

---

[6] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p, Introduction; *see also Cross v. Comm'r of Soc. Sec.*, 375 F. Supp. 2d 724, 732 (N.D. Ohio 2005).

> claimant's treatment has remained conservative and he has consistently reported improvement in symptoms with treatment (medications and injections).

(Tr. 16.)

Roberts's argument is not well taken. First, the ALJ need not analyze all seven factors contained in SSR 96-7p to comply with the regulations. The above statement clearly addressed the medication and other treatment Roberts received to alleviate his pain. Moreover, the ALJ discusses the positive effects of Roberts's treatment later in his opinion when he notes the reported efficacy of the epidural injections and Roberts's own statements of improvement as contained in the medical records. (Tr. 17.) Roberts also ignores the ALJ's discussion of evidence suggesting that Roberts was exaggerating his symptoms, as well as the noted absence of any pain treatment between the time Roberts had surgery in 1999 until 2006. (Tr. 16.) The ALJ's opinion also contains the following discussion:

> Jon Starr, M.D., noted the record contained no medical evidence prior to 2006 (with the gunshot wound occurring in 1995). One record was noted to indicate a history of surgery in 1999, with no mention in any records until 2007 of the claimant's complaints of bilateral lower extremity and left hip pain. Dr. Starr noted the claimant's use of a cane and back brace in follow-up examination on March 23, 2007, with no evidence these were either prescribed or recommended, "is suggestive of at least some level of exaggeration" (Exhibit 4F).... The undersigned notes the lack of prescriptions and recommendations for the assistive devices used by the claimant including a cane, walker, and motorized cart. His treatment has remained conservative and no treatment notes document any functional limitations imposed by treating sources (aside from the conclusions offered in the functional capacity statements).

(Tr. 16.)

The Court finds that the ALJ's credibility analysis is sufficient under the regulations. The ALJ discussed most, if not all, of the factors set forth in SSR 96-7p, and the opinion contained an analysis clear enough to allow this Court to follow the path of reasoning.

19

**VII. Decision**

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence. Accordingly, the decision of the Commissioner is AFFIRMED and judgment is entered in favor of the defendant.

IT IS SO ORDERED.

s/ Greg White<br>
U.S. Magistrate Judge

Date: June 9, 2010